# INTERSTATE GOURMET COFFEE ROASTERS, INC. *vs.* SEACO INSURANCE COMPANY.

No. 01-P-1548.

Bristol. March 18, 2003. - August 26, 2003.

Present: DOERFER, McHUGH, & MILLS, JJ.

*Insurance,* Property damage, Coverage, Construction of policy. *Practice, Civil,* Findings by judge, Appeal, Judicial discretion. *Evidence,* Value.

In an action by the insured under an insurance policy that provided coverage for the insured's coffee roasting plant, seeking damages and cleanup costs for destroyed coffee, the judge did not err or abuse his discretion in determining that the actual cash value of the destroyed coffee was the insured's selling price less unincurred packaging and delivery costs, where, in assessing the actual value of the coffee to the insured at the date of the loss, under the "broad evidence rule," and strictly construing the undefined policy term "actual cash value" against the insurer, the judge was entitled to take into account that (1) the coffee was ready for sale, but for packaging, at the point it was contaminated; (2) there was evidence of the average selling price of the coffee at that time; (3) there was evidence only as to the amount the insured originally paid for the coffee, and not the wholesale cost of the raw beans at the date of loss; and (4) the insured had added value to the coffee over the course of production. [81-84]

In an action by the insured under an insurance policy that provided coverage for the insured's coffee roasting plant, seeking damages and cleanup costs for destroyed coffee, there was no merit to the insurer's contention that, under the "Loss Payment" provision of the policy, the "actual cash value" of the destroyed coffee could not exceed the insured's "financial interest" in the coffee (i.e., no greater than the wholesale cost of the raw coffee beans plus the insured's costs of roasting, blending, and grinding the coffee), where the undefined term "financial interest" was, at best, ambiguous, where the policy expressly contemplated a valuation of "Covered Property" consisting of stock sold but not delivered at the selling price less discounts and expenses the insured would otherwise have had, and where the judge had not erred in determining the actual cash value. [84-85]

In an action by the insured under an insurance policy that provided coverage for the insured's coffee roasting plant, seeking damages and cleanup costs for an accident that destroyed coffee, the judge's findings that (1) the accident required the insured to undertake extensive measures to clean and sanitize its equipment to eliminate any risk of contamination; (2) the claimed employee rates and hours for cleanup were reasonable and neces-

sary, and fairly based on the insured's actual costs to clean and sanitize; and (3) vigorous measures under the personal direction of the insured's president were necessary, were not clearly erroneous. [85]

CIVIL ACTION commenced in the Superior Court Department on December 28, 1998.

The case was heard by *Charles J. Hely*, J.

*William O. Monahan* for the defendant.

*George W. Skogstrom, Jr.*, for the plaintiff.

MILLS, J. The defendant insurance company (Seaco) appeals from a Superior Court judgment determining that, after credits for a partial payment and a deductible, the plaintiff (Interstate) was entitled to recover under its insurance policy for damages and cleanup costs in the amount of $69,504 for destroyed coffee. The judge calculated damages based on the coffee's actual cash value, and determined that the actual cash value was most fairly represented by Interstate's intended selling price, reduced by certain unincurred expenses. The sole issue on appeal is the calculation of damages at actual cash value. We affirm.

*Factual background.* Under an insurance policy (the policy) issued to Interstate, Seaco provided coverage for Interstate's coffee roasting plant. On October 29, 1997, one of Interstate's employees caught his fingers in a coffee grinding machine. The severed parts of the employee's hand entered the machinery, resulting in the contamination, and consequent destruction, of approximately 16,064 pounds of blended Kenyan and Colombian coffee beans that were then in the production process. The process consisted of roasting, blending, and grinding. There was testimony that the coffee was contaminated after roasting and that the next step in the production process was packaging. There is no dispute that the loss of the coffee constituted a covered property loss under the policy.

There was evidence that Interstate paid $24,936.29 for the lost coffee, an amount comprised of $15,417.88 for the raw Colombian coffee and $9,518.41 for the raw Kenyan coffee, and that Interstate's average selling price for the custom-blended coffee in October, 1997, was $5.56 per pound. However, there

was no evidence as to the wholesale cost of the raw coffee beans as of the date of the loss. There was uncontested evidence that Interstate's coffee was a unique flavor blend.

Interstate hired a sanitizing contractor to clean the equipment. Additionally, Interstate's own employees invested 130 labor hours removing the contaminated coffee and disassembling the machinery in preparation for cleaning and sanitation. There was further testimony that, but for these cleanup activities, Interstate's employees would have been engaged in other profit-generating activities for the company.

There was evidence that Interstate incurred debris-removal expenses totaling $12,226, relating to the removal and disposition of the contaminated coffee and the cleansing and sanitizing of its equipment; this amount was comprised of $8,734 for pay and benefits for Interstate employees working to remove and dispose of the contaminated coffee and to clean and sanitize the equipment, $1,325 for a dumpster, and $2,167 for a sanitizing contractor.

The policy provided in pertinent part:

"A. Coverage

". . .

"4. Additional Coverages

"a. Debris removal

"(1) We will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period.

". . .

"E. Loss Conditions

". . .

"4. Loss Payment

". . .

"d. We will not pay you more than your financial interest in the Covered Property.

"..."

"7. Valuation

"We will determine the value of Covered Property in the event of loss or damage as follows:

"a. At actual cash value as of the time of loss or damage, except as provided in b., c., d., e. and f. below.

"..."

"c. 'Stock' you have sold but not delivered at the selling price less discounts and expenses you otherwise would have had."

Although Interstate had received orders for the coffee, the judge determined that, because it had not yet been packaged, the destroyed coffee could not fairly be treated as stock that was "sold but not delivered."[1] He determined that Interstate was, rather, entitled to the "actual cash value" of the coffee, most fairly represented by its selling price for that type of coffee, reduced by unincurred packaging and delivery expenses. The judge found that Interstate's selling price for the 16,064.07 pounds of destroyed coffee would have been $89,316 and that unincurred expenses totaled $3,212.

The judge further found that (1) the accident required Interstate to undertake extensive measures to clean and sanitize its equipment to eliminate any risk of contamination; (2) the claimed employee rates and hours were reasonable and necessary and fairly based on Interstate's actual costs to clean and sanitize the equipment, particularly in light of local health officials' concern about the incident; and (3) vigorous measures under the personal direction of Interstate's president were necessary. The judge determined that Interstate was entitled to $12,226 under the policy for fair cleanup costs.

*Discussion.* Under Mass.R.Civ.P. 52(a), as amended, 423 Mass. 1402 (1996), a trial judge's findings of fact may not be set aside unless "clearly erroneous," and will only be so considered if the reviewing court is left with the firm conviction that a mistake has been made. See *New England Canteen Serv.,*

---

[1]The phrase "sold but not delivered" was not defined in the policy.

*Inc.* v. *Ashley*, 372 Mass. 671, 675 (1977). "The standard to be applied by an appellate court in determining whether the value placed by [a] trial judge on . . . destroyed items is 'clearly erroneous' is . . . 'not one of exact or mechanical precision.' " *Kenney* v. *Rust*, 17 Mass. App. Ct. 699, 706 (1984), quoting from *Markell* v. *Sidney B. Pfeifer Foundation, Inc.*, 9 Mass. App. Ct. 412, 417 (1980). And, on appellate review of a claim of abuse of discretion, "[t]he question is not whether we . . . should have made an opposite decision from that made by the trial judge. To sustain . . . [the claim] it is necessary to decide that no conscientious judge, acting intelligently, could honestly have taken the view expressed by [the trial judge]." *Commonwealth* v. *Bys*, 370 Mass. 350, 361 (1976), quoting from *Davis* v. *Boston Elev. Ry.*, 235 Mass. 482, 502 (1920).

1. *Actual cash value.* Seaco argues that the judge erred or abused his discretion in determining that the actual cash value of the destroyed coffee was Interstate's selling price less unincurred packaging and delivery costs, and that, by so doing, the judge awarded Interstate lost profits as a windfall gain. In valuing property damage, it argues, the principle of indemnity that underlies an insurance policy against property loss is the same principle that underlies judicial redress for torts, namely, to put the party that has sustained damage to its property in the same pecuniary position it would have been in had there been no damage or loss. And, relying on *Tandy Corp.* v. *Boston Pet Supply, Inc.*, 49 Mass. App. Ct. 393 (2000),[2] Seaco further argues that the actual cash value of the destroyed coffee was Interstate's cost of buying the raw beans (i.e., the wholesale price) plus its costs of roasting, blending, and grinding the coffee. Seaco also implicitly argues that the court's "top down" approach (starting with the selling price) to assessing Interstate's damages

---

[2]In *Tandy Corp.* v. *Boston Pet Supply, Inc.*, *supra* at 394-395, this court, adopting the Restatement (Second) of Torts § 911 comment d (1979), held that the plaintiff retail dealer, having lost business inventory in a fire proximately caused by the defendant's negligence, was entitled only to be made whole, and as there was no suggestion that the damaged goods were not freely obtainable on the market or that they had a peculiar value to the owner or a special value for a particular purpose, such as real estate, the plaintiff was only entitled to recover the wholesale price of the goods, and not their market value.

contradicts, or is inconsistent with, the judge's determination that the coffee was not stock that was "sold but not delivered."

Our analysis must start with the principle that exclusions from insurance coverage and ambiguities in an insurance policy are to be strictly construed against an insurer. See *Preferred Mut. Ins. Co.* v. *Gamache*, 426 Mass. 93, 94 (1997). "It is well settled that the principle on which damages are assessed in insurance cases is that of indemnity for the loss actually sustained." *Kingsley* v. *Spofford*, 298 Mass. 469, 474-475 (1937), quoting from *Wall* v. *Platt*, 169 Mass. 398, 405 (1897).

In applying and interpreting an "actual cash value" provision in an insurance contract, courts have adopted several rules or tests including, inter alia, market value, replacement cost, and the "broad evidence rule." See 12 Couch, Insurance §§ 175:24, 175:33 (3d ed. 1998). Massachusetts employs the "broad evidence rule." See, e.g., *Agoos Leather Cos.* v. *American & Foreign Ins. Co.*, 342 Mass. 603, 607-608 (1961). "Under this rule, the trier of facts may consider any evidence logically tending to the formation of a correct estimate of the value of the insured property at the time of loss." 12 Couch, Insurance § 175:33 (3d ed. 1998). In *Agoos Leather Cos.* v. *American & Foreign Ins. Co.*, 342 Mass. at 607, the Supreme Judicial Court stated:

> " 'The words "actual value" in [an insurance policy] . . . are to be interpreted in the light of the nature of the insurance contract as a contract of indemnity. They import that recovery for loss cannot be based upon a value dependent upon fanciful considerations . . . . But the words "actual value" do not import that recovery is limited to market value. . . . "[M]arket value does not in all cases afford a correct measure of indemnity. . . . In some cases there is no market value, properly speaking, and in others, if there is, it plainly would not of itself afford full indemnity."
> . . . [E]ven where market value will not afford the indemnity for which the . . . insurance provides, the cost of replacement, less depreciation, is not conclusive as to the actual value . . . . But it is important evidence of such value to be considered with other evidence.' . . .
> *'Both fair market value and replacement cost are permis-*

*sible standards for determining . . . losses but they are standards and not shackles' "* (emphasis supplied).

We consider the present case to be distinguishable from *Tandy Corp.* v. *Boston Pet Supply, Inc.*, 49 Mass. App. Ct. at 393-395. Unlike the plaintiff in the *Tandy* case, Interstate is a manufacturer, not a retailer. Further, unlike the damaged inventory in *Tandy*, freely obtainable in the market, the destroyed coffee was of peculiar value to Interstate. By processing the coffee to the point at which it was contaminated, Interstate had added considerable value to it. There was uncontested evidence that Interstate's coffee was a unique flavor blend and that, but for packaging and delivery, it was ready for sale. Interstate undertook the cost and risk of buying the raw coffee beans at then current market rates. In fact, no evidence was presented as to the wholesale cost of the raw coffee beans at the date of the loss.

In assessing the actual value of the coffee to Interstate *at the date of the loss*, under the "broad evidence rule," and strictly construing the undefined term "actual cash value" against the insurer, see *Preferred Mut. Ins. Co.* v. *Gamache*, 426 Mass. at 94, the judge was entitled to take into account that (1) the coffee was ready for sale, but for packaging, at the point it was contaminated; (2) there was evidence that Interstate's average selling price for the custom-blended coffee in October, 1997, was $5.56 per pound; (3) no evidence was presented as to the wholesale cost of the raw coffee beans at the date of the loss, only evidence as to the amount Interstate originally paid for the coffee; and (4) Interstate had added value to the coffee over the course of production. There was no abuse of discretion and no error.

2. *Actual cash value and Interstate's financial interest in the coffee.* Somewhat circuitously, Seaco also argues that, under the "Loss Payment" provision of the policy, the "actual cash value" of the destroyed coffee cannot exceed Interstate's "financial interest" in the coffee and, presumably, that Interstate's "financial interest" can be no greater than the wholesale cost of the raw coffee beans plus its costs of roasting, blending, and grinding the coffee. That of course begs the question as to what

constitutes Interstate's "financial interest." The term "financial interest" is not defined in the policy. It is, at best, ambiguous and we thus strictly construe it against the insurer. See *Preferred Mut. Ins. Co.* v. *Gamache, supra.* Seaco's interpretation is further undermined by the fact that the policy expressly contemplates a valuation of "Covered Property" consisting of stock sold but not delivered at "the selling price less discounts and expenses" the insured would otherwise have had. For these reasons, and in light of our holding that the judge did not err in determining the actual cash value, we consider Seaco's argument without merit.

3. *Debris removal costs.* Finally, Seaco argues that the judge erred or abused his discretion by interpreting the debris removal provision of the policy to mean "cleanup costs," including wages and benefits paid to Interstate's employees.

We find Seaco's distinction between "debris removal" costs and "cleanup" costs unpersuasive on the facts of this case. The term "debris removal" is not defined in the policy and, consequently, we construe it strictly against the insurer. See *Preferred Mut. Ins. Co.* v. *Gamache, supra.* The judge made findings that (1) the accident required Interstate to undertake extensive measures to clean and sanitize its equipment to eliminate any risk of contamination; (2) the claimed employee rates and hours were reasonable and necessary, and fairly based on Interstate's actual costs to clean and sanitize the equipment; and (3) vigorous measures under the personal direction of Interstate's president were necessary. The judge's findings were not clearly erroneous. See Mass.R.Civ.P. 52(a); *New England Canteen Serv., Inc.* v. *Ashley,* 372 Mass. at 675.

*Judgment affirmed.*